UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60091-CIV-ALTMAN/Hunt

HOUSTON SPECIALTY
INSURANCE COMPANY,

     *Plaintiff,*

v.

DAVID FENSTERSHEIB *and*
FENSTERSHEIB LAW GROUP, P.A.,

     *Defendants.*

_____/

**ORDER**

Our Plaintiff, Houston Specialty Insurance Company, issued a claims-made-and-reported professional-liability policy (the "Policy") to our Defendants, Robert J. Fenstersheib[1] and the Fenstersheib Law Group (the "Law Firm"). In 2019, a group of medical providers and facilities (the "Provider Plaintiffs") sued the Defendants in state court, asserting claims of civil theft, conversion, and breach of contract (among others).[2] In a nutshell, the Underlying Lawsuit alleged that one of the Law Firm's case managers had embezzled millions of dollars of the firm's money—much of which the Law Firm owed to the Provider Plaintiffs under the terms of lien agreements (and letters of protection) the Provider Plaintiffs had signed with the Law Firm.

Houston defended the Underlying Lawsuit under a complete reservation of rights.[3] While the case was pending, though, Houston sued our Defendants here in federal court. *See* Compl. [ECF No.

---

[1] Robert J. Fenstersheib passed away during this litigation—so his son, David Fenstersheib, administrator ad litem for the Estate of Robert J. Fenstersheib, has substituted in as a Defendant in our case. *See* Order Granting the Defendants' Motion to Reopen the Case and Substitute the Defendant [ECF No. 73].

[2] We'll refer to this state-court case as the Underlying Lawsuit.

[3] The Provider Plaintiffs and the Defendants have settled the Underlying Lawsuit (more on that later).

1]. In the now-operative Amended Complaint, Houston seeks a declaration of "no coverage" under four different theories: No Coverage Under Exclusion K for Theft of Funds (Count I); No Coverage Under Exclusion B for Prior Knowledge (Count II); No Coverage Under the Insuring Agreement and Retroactive Date Endorsement (Count III); and No Coverage Under Other Policy Exclusions (Count IV). *See generally* Am. Compl. [ECF No. 76]. Houston also wants reimbursement for the fees and costs it incurred defending the Underlying Lawsuit. *Id.* at 7.

After some protracted litigation, the parties filed their cross-motions for summary judgment, which we now resolve.[4] As we explain in more detail below, we conclude that the Policy's "Theft of Funds Exclusion" precludes coverage for the Underlying Lawsuit—in other words, that Houston has no duty to defend or indemnify the Defendants because the entire Underlying Lawsuit *arose out of*, *related to*, or *involved* a theft. We thus **GRANT** Houston's Motion for Summary Judgment ("Pl.'s MSJ") [ECF No. 156] and **DENY** the Defendants' Motion for Summary Judgment ("Defs.' MSJ") [ECF No. 159].[5]

---

[4] "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (cleaned up). In adjudicating cross-motions, we consider each motion separately and, of course, resolve all reasonable inferences against the movant. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).

[5] Both motions are fully briefed and ripe for adjudication. *See* Defendants' Response to Houston's Motion for Summary Judgment ("Defs.' Response") [ECF No. 170]; Houston's Reply in Support of its Motion for Summary Judgment ("Pl.'s Reply") [ECF No. 172]; Houston's Response to Defendants' Motion for Summary Judgment ("Pl.'s Response") [ECF No. 167]; Defendants' Reply in Support of its Motion for Summary Judgment ("Defs.' Reply") [ECF No. 174].

THE FACTS[6]

**A.    The Law Practice**

The Law Firm is a personal-injury firm that referred hundreds of its clients to a group of medical providers who agreed to treat the clients in exchange for guaranteed payments from the clients' eventual settlements or judgments. *See* JSOF ¶ 1. This arrangement was necessary because the Law Firm's clients often lacked health insurance and would otherwise have been unable to pay for medical treatment. *Id.* ¶ 2. To guarantee payment, the medical providers received "written contractual liens executed by both [the Law Firm] and their clients," which required the Law Firm "to withhold recovered monies and pay the providers." *Id.* ¶ 3. The Law Firm and its clients also signed letters of protection, which obligated the Law Firm to "pay [the medical providers] directly" all "such sums of monies as may be due and owing to them" for services rendered. Pl.'s SOF ¶ 4; Defs.' Response SOF ¶ 4 ("Undisputed."). In these contracts, the Law Firm "expressly agreed to comply with their clients' directives and to withhold any trust funds subject to the '[Contracts]' with the providers." Pl.'s SOF ¶ 5; Defs.' Response SOF ¶ 5 ("Undisputed.").

**B.    The Policy**

Houston issued a claims-made-and-reported professional-liability insurance policy to the "Law Offices of Robert J. Fenstersheib & Associates P.A." Joint SOF ¶ 11. The Policy's first term ran from September 1, 2017, through September 1, 2018, and it was renewed for the period from September 1, 2018, through September 1, 2019. *Ibid.* The Policy included three exclusions (among others). The first, which we'll call the Prior Knowledge Exclusion, provided:

This Policy does not apply to: . . .

---

[6] "The facts are described in the light most favorable to the non-moving party." *Plott v. NCL Am., LLC*, 786 F. App'x 199, 201 (11th Cir. 2019); *see also Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002) ("[F]or summary judgment purposes, our analysis must begin with a description of the facts in the light most favorable to the [non-movant]."). We accept these facts for summary-judgment purposes *only* and recognize that "[t]hey may not be the actual facts that could be established through

3

**B. PRIOR KNOWLEDGE.** Any claim arising out of any Wrongful Act occurring prior to the effective date of this Policy if:

1. The matter had previously been reported to any insurance company, or

2. The Insured at or before the effective date of this Policy knew or could have reasonably foreseen that such Wrongful Act might be expected to be the basis of a Claim . . .

However, in no event will a Claim be covered under this Policy if it is attributable to or arises out of a Wrongful Act that occurred Prior to this Policy's Retroactive Date[.]

Pl.'s SOF ¶ 46; Defs.' Response SOF ¶ 46 ("Undisputed."); *see also* Policy at 49 [ECF No. 156-

17]. The second, which we'll refer to as the Theft of Funds Exclusion, stated:

This Policy does not apply to: . . .

**K. IMPROPER USE OF FUNDS/THEFT.** Any claim arising out of, relating to or involving improper commingling of client funds, conversion of anyone's funds, theft of anyone's funds, the wire transfer of anyone's funds . . . a counterfeit check or a check bearing anyone's forged or bogus signature[.]

Pl.'s SOF ¶ 47; Defs.' Response SOF ¶ 47 ("Undisputed."); *see also* Policy at 50. The third,

which we've labelled the Contractual Liability Exclusion, read as follows:

This Policy does not apply to: . . .

**Q. CONTRACTUAL LIABILITY.** Any claim arising out of liability assumed by an Insured under any contract or agreement, whether oral or written[.]

Pl.'s SOF ¶ 48; Defs.' Response SOF ¶ 48 ("Undisputed."); *see also* Policy at 51.

---

live testimony at trial." *Snac Lite, LLC v. Nuts 'N More, LLC*, 2016 WL 6778268, at *1 n.1 (N.D. Ala. Nov. 16, 2016); *see also Cox Adm'r US Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. They are, however, the facts for present purposes[.]" (cleaned up)). In considering Houston's MSJ, then, we describe the facts in the light most favorable to the Defendants—drawing mostly from the parties' Joint Statement of Facts ("JSOF") [ECF No. 157] and from the Defendants' Response Statement of Facts ("Defs.' Response SOF") [ECF No. 169]. We thus rely on Houston's Statement of Facts ("Pl.'s SOF") [ECF No. 156-1] *only* where the Defendants have failed to genuinely dispute a proposition Houston has asserted there. *See* S.D. FLA. L.R. 56.1(b) ("All material facts set forth in the movant's statement filed and supported as required above will be deemed admitted unless controverted by the opposing party's statement provided that the Court finds that the movant's statement is supported by evidence in the record.").

The Policy defined the Retroactive Date referenced in the Prior Knowledge Exclusion (Exclusion B) this way:

> [T]he date specified in the Declarations or in any endorsement attached hereto, on or after which any Wrongful Act must have occurred in order for Claims arising therefrom to be covered under this policy. Claims arising from any Wrongful Acts occurring prior to this date are not covered.

Pl.'s SOF ¶ 45; Defs.' Response SOF ¶ 45 ("Undisputed."); *see also* Policy at 106.

### C.      The Theft

On July 26, 2017, the Law Firm discovered that one of its employees, Michael Wihlborg, had embezzled millions of dollars from the firm's trust account. JSOF ¶ 4. Wihlborg, a case manager, was responsible for preparing clients' closing statements—which outlined how much money would go to the Law Firm, the client, and the medical providers after settlements or judgments. Pl.'s SOF ¶ 9; Defs.' Response SOF ¶ 9 ("Undisputed."). The Law Firm uncovered Wihlborg's theft when (while Wihlborg was out sick) a client called to ask about a settlement. Pl.'s SOF ¶ 10; Defs.' Response SOF ¶ 10 ("Undisputed."). An office manager who looked into the matter soon discovered that one of the medical providers on the case hadn't been paid—even though the Law Firm's software showed a payment to a *similarly* named vendor. Pl.'s SOF ¶ 10; Defs.' Response SOF ¶ 10 ("Undisputed."). The office manager then found payments Wihlborg had made to several other fictitious medical vendors— all owned by Wihlborg and his co-conspirators. Pl.'s SOF ¶ 11; Defs.' Response SOF ¶ 11 ("Undisputed.").

On August 7, 2017, the Law Firm hired T.M. Duggan Investigation to probe the extent of Wihlborg's misconduct. Pl.'s SOF ¶ 12; Defs.' Response SOF ¶ 12 ("Undisputed."). On August 18,

someone from the Law Firm met with the U.S. Attorney's Office.[7] Pl.'s SOF ¶ 13; Defs.' Response SOF ¶ 13 ("Undisputed."). A Law Firm representative also met with the Hallandale Beach Police Department on August 21, 2017, *see* Pl.'s SOF ¶ 14; Defs.' Response SOF ¶ 14 ("Undisputed."), and with the FBI and the Secret Service on August 22, 2017, *see* Pl.'s SOF ¶ 16; Defs.' Response SOF ¶ 16 ("Undisputed.").[8]

On August 21, 2017, the Law Firm hired a forensic accounting firm, Kaufman Rossin & Co. ("Kaufman"), to prepare a report on the theft. Joint SOF ¶ 5. Kaufman completed its initial report on October 26, 2017, *id.* ¶ 6, and a supplemental report on August 14, 2019, *id.* ¶ 7. The 2017 Kaufman Report concluded that "KR identified 697 client matters totaling approximately $6.6 million of funds that appear to have been diverted by Wihlborg since 2002." Pl.'s SOF ¶ 19; Defs.' Response SOF ¶ 19 ("Do not dispute that the report states this, but dispute that the fact is material, as the funds diverted between 2002 through 2014 were solely from medical providers that are not the subject of the claims asserted by the Bauer Plaintiffs or the Instant Lawsuit."). On November 7, 2017 (more than three months after learning of Wihlborg's embezzlement), the Law Firm reported the theft to the Florida Bar. JSOF ¶ 8. In a December 7 submission to the Bar, the Law Firm recounted the steps it took after it uncovered the fraud (including its contact with various law-enforcement agencies and its retention of a private investigator). Pl.'s SOF ¶ 25; Defs.' Response SOF ¶ 25 ("Undisputed."); Letter to the Bar [ECF No. 156-12] at 1, 14. Eventually, on August 9, 2019, the Law Firm submitted a sworn prof of loss to its embezzlement insurer, Phoenix Insurance Company, in the amount of $6,556,956. Pl.'s SOF ¶ 32; Defs.' Response SOF ¶ 32 ("Undisputed.").

---

[7] We're not sure how the U.S. Attorney's Office got involved, but Houston points to Fenstersheib's Timeline [ECF No. 156-6] at 1, which reads: "U.S. Attorney. Date: 8/11/2017. Contact: Julia Valenti. Title: Supervisor. Action: Tim Duggan's first contact/meeting with Ms. Valenti."

[8] Fenstersheib's Timeline tells us that, on August 22, 2017, there was an in-person meeting between FBI Special Agent Leonard Fuela, Mrs. Davis (the office manager), Robert Fenstersheib, Tim Duggan, and Secret Service Special Agent Thrower.

The Law Firm first reported the matter to Houston on June 21, 2018—eleven months after learning of the theft. JSOF ¶ 12. Houston initially denied coverage. *Id.* ¶ 13; *see also* Letter Denying Coverage [ECF No. 156-19] at 1 ("After careful review of available information, Houston has determined that no coverage exists for this claim."). Then, a year later—after the Underlying Lawsuit was filed and after Fenstersheib sought reconsideration of the denial—Houston agreed to defend the Underlying Lawsuit under a complete reservation of rights. Pl.'s SOF ¶ 54; Defs.' Response SOF ¶ 54 (failing to genuinely dispute this fact); [9] *see also* Li Letter [ECF No. 156-20] at 1 ("We request that Houston withdraw its coverage denial and defend and indemnify the Insureds in [the Underlying Lawsuit].") ; Houston ROR Letter [ECF No. 156-21] at 1 ("As set forth below, Houston Specialty will

---

[9] According to Houston, it's undisputed that "HSIC denied coverage but at Fenstersheib's request on August 19, 2019, [Houston] agreed to defend under a complete reservation of rights." Pl.'s SOF ¶ 54. In their Response SOF, the Defendants call this fact "Disputed as phrased." Defs.' Response SOF ¶ 54. Houston, the Defendants say, "agreed to defend after Fenstersheib re-submitted the Claim upon receipt of the underlying lawsuit." *Ibid.* We're not sure what exactly the Defendants are disputing here. They agree elsewhere *both* that "Houston denied coverage," JSOF ¶ 13, *and* that, "[o]n August 19, 2019, [Houston] agreed to defend Fenstersheib under a complete reservation of rights," *id.* ¶ 14. So, neither of those statements can be in dispute. It's possible their issue is with the phrase "at Fenstersheib's request"—but we can't accept that either. In support of their Response SOF, the Defendants point to two documents: *first*, a letter from Arya Li (on behalf of the Defendants) to George Rockas (on behalf of Houston) in response to Houston's initial denial of coverage, *see* Li Letter [ECF No. 156-20]; and *second*, Houston's letter to Fenstersheib, in which the insurer agreed to defend the Underlying Lawsuit "under a complete reservation of rights," Houston ROR Letter [ECF No. 156-21]. These two letters, though, *confirm* that Houston agreed to defend the Underlying Lawsuit at the Defendants' request. *See* Li Letter at 1 ("We request that Houston withdraw its coverage denial and defend and indemnify the Insureds in [the Underlying Lawsuit].") ; Houston ROR Letter at 1 ("As set forth below, Houston Specialty will provide you and FLG with a defense, but under a complete reservation of rights because there are significant questions regarding the existence of coverage."). And the Defendants have produced no *other* evidence to contradict the facts we've gleaned from these documents. They haven't, in short, created a genuine dispute of material fact on this issue. *See RLI Ins. Co. v. Alfonso*, 2021 WL 430720, at *7 (S.D. Fla. Feb. 8, 2021) (Altman, J.) ("Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to come forward with specific facts showing there is a genuine issue for trial." (cleaned up)); *see also* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials[.]").

provide you and FLG with a defense, but under a complete reservation of rights because there are significant questions regarding the existence of coverage.").

While the Defendants were working with law enforcement, accountants, investigators, and insurers, they also informed the Provider Plaintiffs about the theft. *See* Pl.'s SOF ¶ 31 ("[Fenstersheib] testified that within a day or two of discovering the theft, he notified the owner of the medical providers, Brian Bauer, and began working with them as part of an effort to resolve any potential claims against the firm."); Defs.' Response SOF ¶ 31 (agreeing that "Mr. Fenstersheib notified Mr. Bauer and began working with him," but stating that "the intention of both parties was to seek recovery solely from third parties."); Underlying Complaint [ECF No. 156-2] ¶ 103 ("In 2017, Defendants notified a representative of [Provider] Plaintiffs of its theft."). The Provider Plaintiffs alleged in the Underlying Lawsuit that (at first) the Defendants appeared open to collaborating. As the Underlying Complaint explained: "Before providing more details to Plaintiffs, Defendants requested additional time to investigate the matter and provide a detailed disclosure. Defendants also stated that they would purportedly be transparent with Plaintiffs about their investigation, and work closely with Plaintiffs to ensure they received full payment of funds owed for the Impacted Firm Clients." *Id.* ¶ 103. At some point, though, these collaborative efforts fell apart. *See* Pl.'s SOF ¶ 7 ("In the summer of 2017, the relationship between Fenstersheib and the providers soured."); Defs.' Response SOF ¶ 7 ("The relationship between Fenstersheib and the Bauer medical providers who are the subject of the Underlying Lawsuit and Claim soured in the Spring into Summer of 2018.").

When the Provider Plaintiffs asked for more detailed information about the scope of Wihlborg's theft, the "Defendants began to curtail their discussions with [Provider] Plaintiffs about the fraud, and refused to provide [Provider] Plaintiffs with access to relevant records so that [Provider] Plaintiffs could investigate and identify the full scope of the fraud against them." Underlying Complaint ¶ 104. The Defendants provided "a purported accounting, listing the Impacted Firm

Clients as the list of Firm Clients whose trust funds were stolen by [Wihlborg] and setting out a total of approx. $2.3 million in funds owed to [Provider] Plaintiffs and stolen by [Wihlborg.]" *Id.* ¶ 105. According to the Provider Plaintiffs, however, this "was a cursory document. . . . It did not disclose the amounts actually owed to each of the [Provider] Plaintiffs for services to the Impacted Firm Clients, which was much greater than the amount of theft. . . . And it was an incomplete list of the Firm Clients who had obtained financial recoveries subject to [Provider] Plaintiffs' liens and for whom [Provider] Plaintiff[s] had not yet been paid." *Ibid.* The Provider Plaintiffs alleged that this incomplete accounting represented the end of the Defendants' efforts at cooperation, *id.* ¶ 106, and that thereafter the Defendants "engaged in improper efforts to coerce and pressure [Provider] Plaintiffs to accept a significantly reduced payment for the Medical Care they provided to the Impacted Firm Clients and to discontinue their investigation and pursuit of claims related to [Defendants'] misconduct," *id.* ¶ 107.

How did they do this? Well, first of all, according to the Underlying Complaint, they "threatened to no longer refer their personal injury clients to [Provider] Plaintiffs and to divert existing Firm Clients who were receiving Medical Care from the [Provider] Plaintiffs." *Id.* ¶ 108. And, when the "[Provider] Plaintiffs did not succumb to that threat," the Underlying Complaint averred, the "Defendants followed through[.]" *Id.* ¶ 109. "Next, Defendants attempted to ratchet up the pressure by withholding payments owed to [Provider] Plaintiffs for previously-rendered Medical Care. They did this by interpleading any settlement funds obtained on behalf of Firm Clients who had received Medical Care [Provider] Plaintiffs and contesting [Provider] Plaintiffs' claims for payment in those proceedings." *Id.* ¶ 110. As a result, by the time they filed the Underlying Complaint, the "[Provider] Plaintiffs ha[d] not received *any* payment towards the amounts owed to them for Medical Care rendered to the Impacted Firm Clients." *Id.* ¶ 111 (emphasis added).

## D.    The Underlying Lawsuit

The Provider Plaintiffs sued the Defendants in state court on July 30, 2019. JSOF ¶ 10. The

Underlying Complaint asserted nine claims against the Defendants: civil theft, *see* Underlying Complaint ¶¶ 114–25; conversion, *id.* ¶¶ 126–36; breach of fiduciary duty, *id.* ¶¶ 137–46; constructive fraud, *id.* ¶¶ 147–56; negligence, *id.* ¶¶ 157–65; negligent retention, *id.* ¶¶ 166–76; breach of contract, *id.* ¶¶ 177–83; promissory estoppel, *id.* ¶¶ 184–90; and accounting, *id.* ¶¶ 191–99. In their complaint, the Provider Plaintiffs alleged that "[t]he firm manager [Wihlborg] stole approximately $2 million in client funds owed to Plaintiffs for medical care provided to Firm clients and subject to Plaintiffs' liens," *id.* ¶ 8, and that the "[Provider] Plaintiffs were owed much more than [the theft amount] from the Impacted Firm Clients for their Medical Care. . . . Because Defendants disbursed the Impacted Firm Clients' funds based on the Firm Manager's falsified Closing Statements, the Firm no longer holds those additional funds subject to Plaintiffs' liens," *id.* ¶ 101.[10]

In total, the Provider Plaintiffs sought in excess of $10 million in damages: the $2.3 million Wihlborg had stolen, plus money the Law Firm *still* owed, but had not paid, to the Provider Plaintiffs. Defs.' Response SOF (Additional Facts) ¶ 5 ("The Bauer Plaintiffs sought in excess of $10 million in the Underlying Lawsuit for other claims, recognizing that only $2.3 million was taken in the theft."); Pl.'s Reply SOF (Additional Facts) ¶ 5 ("First, the medical providers allege Wihlborg stole from the Firm's trust account $2.3 million in settlement funds owed to them . . . . Second, Wihlborg's scheme also involved tampering/falsifying the Firm's closing statements and records. This caused the Firm to disburse funds and 'the Firm no longer holds those additional funds subject to [Provider] Plaintiffs' liens.' The total amount of the liens is 'approximately $10 million.'" (cleaned up)).

There was also a second state-court case that overlapped with the Underlying Lawsuit—the so-called "Patient Action"—which Houston likewise defended under a complete reservation of rights.

---

[10] Although the parties haven't cited this portion of the Underlying Complaint, the Federal Rules allow us to rely on record evidence the parties *didn't* reference. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

Pl.'s SOF ¶ 57; Defs.' Response SOF ¶ 57 ("Undisputed that HSIC agreed to voluntarily undertake the defense on non-insureds in the Patient Action."). Houston defended Fenstersheib and the Law Firm until both cases were settled pursuant to a global settlement agreement. Pl.'s SOF ¶ 58; Defs.' Response SOF ¶ 58 ("Undisputed."). The global settlement—for a total of $5.5 million—didn't allocate between covered and uncovered damages (that is, between the damages Houston might have a duty to indemnify and those it might not). Pl.'s SOF ¶ 59; Defs.' Response SOF ¶ 59 ("Undisputed.").

### THE LAW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the records, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c). "By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.* "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always

bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for the trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (cleaned up); *see also* FED. R. CIV. P. 56(e).

When ruling on a motion for summary judgment, the Court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."); *HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703 F. App'x 814, 817 (11th Cir. 2017) (noting that a "court may decide a motion for summary judgment without undertaking an independent search of the record" (quoting FED. R. CIV. P. 56 advisory committee's note to 2010 amendment)). In any event, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). "[A]ssessments of credibility—no less than the weighing of evidence—are fact questions not susceptible of disposition at summary judgment." *Obremski v. Armor Corr. Health Servs., Inc.*, 467 F. Supp. 3d 1265, 1275 (S.D. Fla. Apr. 7, 2020) (Altman, J.) (citing *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012)).

"[I]f there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial." *Torres v. Wal-Mart Stores E., LP*, 555 F. Supp. 3d 1276, 1282 (S.D. Fla. Aug. 17, 2021) (Altman, J.). The Court, on the other hand, must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of [its] case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Child. & Fams.*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (cleaned up)).

ANALYSIS

In its MSJ, Houston identifies four grounds on which (it says) we should find that it had no duty to defend: the Prior Knowledge Exclusion, *see* Pl.'s MSJ at 3–11; the Retroactive Date Endorsement, *see id.* at 11–14; the Theft of Funds Exclusion, *see id.* at 14–18; and the Contractual Liability Exclusion, *see id.* at 18–21. We begin and end our analysis, though, with the Theft of Funds Exclusion. On this issue, Houston advances only one salient question: Does the Underlying Lawsuit "aris[e] out of, relat[e] to or involv[e] . . . conversion of anyone's funds [or] theft of anyone's funds[?]" Because the answer to this question is "yes," Houston had no duty to defend *or* indemnify the Defendants.

### A.      The Text of the Policy

"Under Florida law, the determination of an insurer's duty to defend falls under the so-called 'eight corners rule,' the name of which refers to the four corners of the insurance policy and the four corners of the underlying complaint." *Addison Ins. Co. v. 4000 Island Blvd. Condo. Ass'n, Inc.*, 721 F. App'x 847, 854 (11th Cir. 2017) (quoting *Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So. 3d 174, 182 (Fla. 4th DCA 2015). And, when we interpret the Policy, we focus on the plain meaning of its text. *See Payroll Mgmt., Inc. v. Lexington Ins. Co.*, 815 F.3d 1293, 1300 (11th Cir. 2016) ("Under Florida law, insurance contracts are construed according to their plain meaning." (cleaned up)); *see also Swire Pac. Holding, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003) ("[I]nsurance contracts must be construed in accordance with the plain language of the policy.").

As we've said, the Policy excludes coverage for "[a]ny claim arising out of, relating to or involving improper commingling of client funds, conversion of anyone's funds, theft of anyone's funds, the wire transfer of anyone's funds . . . a counterfeit check or a check bearing anyone's forged or bogus signature[.]" Policy at 50. Houston argues that the Theft of Funds Exclusion applies because "the underlying complaint specifically alleges that plaintiffs' alleged loss arises out of Wihlborg's theft

13

of millions of dollars from Fenstersheib's trust account." Pl.'s MSJ at 14. The Defendants, for their part, divide the Underlying Complaint into "theft claims, and non-theft claims," Defs.' Response at 5, and take the position that, "[o]f the eight counts for monetary relief in the Underlying Complaint, only two allege damages arising out of or related to the Wihlborg theft," *id.* at 13. Here, of course, they mean Count I (which charged civil theft) and Count II (which charged conversion). But, in the Defendants' view, six of the remaining seven claims in the Underlying Complaint (what they call the non-theft claims) are "separate and apart from any theft of funds[.]" *Id.* at 14.[11] And (the Defendants say), since the Policy doesn't exclude the non-theft claims, Houston had a duty to defend the *entire* Underlying Lawsuit. *Ibid.*

The Defendants' reading of the Policy—though alluring at first glance—ultimately ignores several key words and phrases. To understand what's being omitted, imagine a policy that excluded "[a]ny claims for conversion of anyone's funds or theft of anyone's funds." That exclusion would unambiguously bar coverage for conversion and theft claims—like Counts I and II of the Underlying Complaint—but little else. As relevant here, that exclusion wouldn't preclude coverage for the remaining counts (what the Defendants have labeled "the non-theft claims")—which include negligence, negligent retention, breach of contract, breach of a fiduciary duty, constructive fraud, and promissory estoppel, and accounting. And it's this hypothetical policy exclusion the Defendants *wish* they had negotiated with Houston.

But the exclusion we have actually includes a host of *other* words and phrases—all of which plainly work to *expand* the categories of excluded claims. Our exclusion (again) bars coverage for "[a]ny claim *arising out of, relating to or involving* . . . conversion of anyone's funds [or] theft of anyone's funds[.]" These three phrases—arising out of, relating to, or involving—must mean *something*. *See* A. SCALIA &

---

[11] We say six of seven because the Defendants inexplicably ignore the ninth count (for accounting). *See* Response at 13–14.

B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 150 (2012) ("The surplusage canon holds that it is no more the court's function to revise by subtraction than by addition. . . . Or in the words of Thomas M. Cooley: '[T]he courts must . . . lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.'"); *see also United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."). And, since we've agreed that the exclusion would mean precisely what the Defendants now say it means *without* any of these three phrases, then we can begin to see *both* that the Defendants' reading is wrong *and* that the addition of these three phrases must broaden the universe of excluded claims.

The question is: How broad? And the answer seems to be "quite broadly." As the Eleventh Circuit, quoting the Florida Supreme Court, has explained:

> [T]he phrase "arising out of" is *not* ambiguous and should be interpreted *broadly*. The [Florida Supreme Court] declared that "the term 'arising out of' is broader in meaning than the term 'caused by' and means 'originating from,' 'having its origin in,' 'growing out of,' 'flowing from,' 'incident to,' or 'having a connection with.'" To have arisen out of something, there must be "some causal connection, or relationship[,]" that is "more than a mere coincidence" but proximate cause is not required.

*James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1275 (11th Cir. 2008) (emphasis added & cleaned up) (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 539 (Fla. 2005)); *see also Phila. Indem. Ins. Co. v. Stazac Mgmt., Inc.*, 2018 WL 2445816, at *13 (M.D. Fla. May 31, 2008) (Morales Howard, J.) (finding that a theft exclusion barred coverage for civil theft, conversion, *and negligence* and that the exclusion's meaning was "clear and plain, something only a lawyer's ingenuity could make ambiguous.").

Under its plain meaning, then, the Theft of Funds Exclusion bars coverage for "[a]ny claim originating from, having its origin in, growing out of, flowing from, incident to, having a connection that is more than mere coincidence with, or involving improper commingling of client funds, conversion of anyone's funds, theft of anyone's funds, the wire transfer of anyone's funds . . . a

counterfeit check or a check bearing anyone's forged or bogus signature[.]" Our final task, then, is to apply this definition to the specific claims the Provider Plaintiffs asserted in the Underlying Complaint.

### B.        The Duties to Defend & Indemnify

With our definition in mind, we easily conclude that Houston had no duty to defend the Defendants in the Underlying Lawsuit. Under Florida law, the insurer's duty to defend is triggered when the underlying complaint against its insured "fairly brings the case within the scope of coverage." *Princeton Excess & Surplus Lines Ins. Co. v. Hub City Enters., Inc.*, 808 F. App'x 705, 708 (11th Cir. 2020) (cleaned up). "If there is any doubt about the insurer's duty to defend, then the ambiguity must be resolved in favor of the insured." *Ibid.*; *see also Stephens v. Mid-Continent Cas. Co.*, 749 F.3d 1318, 1323 (11th Cir. 2014) ("The duty to defend arises if the relevant pleadings allege facts that fairly and potentially bring the suit within policy coverage." (cleaned up)). "If the [underlying] complaint alleges facts partially within and partially outside the scope of coverage, the insurer is obligated to defend the entire suit." *MJCM, Inc. v. Hartford Cas. Ins. Co.*, 2010 WL 1949585, at *4 (M.D. Fla. May 14, 2010) (citing *Battisti v. Cont'l Cas. Co.*, 406 F.2d 1318, 1321 (5th Cir. 1969)).

When the allegations in the underlying complaint "show either that a policy exclusion applies or that no coverage exists, no duty to defend arises." *Kenneth Cole Prods., Inc. v. Mid-Continent Cas. Co.*, 763 F. Supp. 2d 1331, 1334 (S.D. Fla. 2010) (Jordan, J.) (citing *Fed. Ins. v. Applestein*, 377 So. 2d 229, 232 (Fla. 3d DCA 1979)). But, when an insurer relies on a policy exclusion to deny coverage, "it has the burden of demonstrating that the allegations of the complaint are cast solely and entirely within the policy exclusion and are subject to no other reasonable interpretation." *Hartford Acc. & Indem. Co. v. Beaver*, 466 F.3d 1289, 1296 (11th Cir. 2006). While ambiguous policy language is construed against the drafter and in favor of the insured, "exclusionary clauses are construed even more strictly against the insurer than coverage clauses." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Any doubt regarding the duty to defend is resolved in favor of the insured. *See Miranda Constr. Dev., Inc. v.*

*Mid-Continent Cas. Co.*, 763 F. Supp. 2d 1336, 1339 (S.D. Fla. 2010) (Graham, J.).

All of the Underlying Complaint's claims "originat[ed] from, hav[e] [their] origin in, [grew] out of, flow[ed] from, [were] incident to, or hav[e] a connection with" Wihlborg's theft. Recall the three ways in which the Provider Plaintiffs said they were harmed: (1) by losing the money Wihlborg had stolen directly (about $2.3 million), *see, e.g.,* Underlying Complaint ¶ 8; (2) by missing out on other payments the Law Firm didn't make to the Provider Plaintiffs because it was improperly "disbursing" funds to the wrong places "*based on* [Wihlborg's] falsified Closing Statements," *id.* ¶ 101 (emphasis added); and (3) by losing out on money the Law Firm elected not to pay the Provider Plaintiffs, after the parties' cooperation broke down, as a way of "ratchet[ing] up the pressure by withholding payments owed to [Provider] Plaintiffs for previously-rendered Medical Care," *id.* ¶ 110—all in an effort to "coerce and pressure [Provider] Plaintiffs to accept a significantly reduced payment for the Medical Care they provided to the Impacted Firm Clients and to discontinue their investigation and pursuit of claims related to [Defendants'] misconduct," *id.* ¶ 107.[12]

Let's take these three buckets one at a time. The first bucket (claims for the money Wihlborg stole directly) indisputably *arose from*, *related to*, or *involved* Wihlborg's theft—and the Defendants don't appear to think otherwise. *See* Defs.' Response at 13 ("Of the eight counts for monetary relief in the Underlying Complaint, only two [Counts I and II] allege damages arising out of or related to the Wihlborg theft.").

The second bucket (the additional funds the Law Firm improperly disbursed to itself and others) likewise *arose from*, *related to*, or *involved* Wihlborg's fraud because the Underlying Complaint *specifically* alleged, as to these monies, that, "*based on* [Wihlborg's] falsified Closing Statements," the Law

---

[12] This third bucket of harms doesn't appear in any of the Underlying Complaint's counts. We include it here, though, because it *does* appear elsewhere in the Underlying Complaint and because we want to make sure we've properly accounted for any argument the Defendants might one day make for their view that *some* portion of the Underlying Lawsuit didn't *arise from* Wihlborg's fraud.

Firm "collect[ed] its fees and costs and disburse[d] the clients' funds without having to first resolve [Provider] Plaintiffs' invoices, which, as noted, were approximately $10 million[.]" Underlying Complaint ¶¶ 101–02 (emphasis added). Here's how the Underlying Complaint tied these improper disbursements to Wihlborg's fraud: *First*, when the Law Firm received funds from a settlement or judgment on a client's behalf, "[Wihlborg] did *not* notify the appropriate [Provider Plaintiffs] that the Firm had received funds subject to the [Provider Plaintiffs'] liens." *Id.* ¶ 95 (emphasis in original). Next, "with [Provider] Plaintiffs unaware of the recovery, [Wihlborg] prepared Closing Statements for the Impacted Firm Clients that included proposed disbursements to the Fake Companies that posed as [Provider Plaintiffs]." *Id.* ¶ 96. Then, the Law Firm would draft checks payable to Wihlborg's fake companies, and Wihlborg "presented those checks to Defendant Fenstersheib for his signature[.]" *Id.* ¶ 97. Once the checks were signed, Wihlborg would *either* "directly deposit[ ] those checks into bank accounts established in the name of the fake companies" or "h[o]ld onto the check[s] (sometimes for years), wait[ ] to see if [Provider] Plaintiffs noticed that payment had not been made, and then void[ ] the original check and ha[ve] the Firm cut a new check to the fake company, which he['d] deposit[ ] into its account." *Ibid.* And, of course, the Provider Plaintiffs "did not know this was occurring" because the Law Firm never told them that "funds were received by the Firm subject to [Provider] Plaintiffs' liens[.]" *Ibid.* In total, Wihlborg "stole approx. $2 million in funds owed to [Provider] Plaintiffs for Medical Care . . . through false checks diverted to fake companies," *id.* ¶ 101, but that sum represented only a portion of the Provider Plaintiffs' liens. In fact, the "[Provider] Plaintiffs were owed much more than that." *Ibid.* The liens Wihlborg fraudulently eliminated in his falsified closing statements totaled "approximately $10 million—significantly in excess of the approximately $2 million stolen." *Id.* ¶ 102.

So, where did that extra money go? Well, the Provider Plaintiffs alleged that, "based on the Firm Manager's falsified Closing Statements," *id.* ¶ 101, "Defendants collected the full amount of

attorneys' fees and costs . . . and disburse[d] the clients' funds without having to first resolve [Provider] Plaintiffs' invoices," *id.* ¶ 102. Thus, "[b]ecause Defendants disbursed the Impacted Firm Clients' funds based on the Firm Manager's falsified Closing Statements, the Firm no longer holds those additional funds subject to [Provider] Plaintiffs' liens." *Id.* ¶ 101. Wihlborg's scheme, in other words, served to "eliminate the [Provider] Plaintiffs' liens in [the Law Firm's] favor." *Id.* ¶ 102.

These detailed factual allegations make clear just how much these additional losses (what we've called bucket two) were "based on" Wihlborg's fraud. A simple example will highlight the point. Imagine that the Law Firm settled a case for $100. Imagine, too, that the Provider Plaintiff with a lien on that case was owed $40 and that the Law Firm's fees and costs totaled $30. The Underlying Complaint alleged that, in many such cases, Wihlborg stole—which is to say, cut a check to an account he operated under a name that looked a lot like the Provider Plaintiff's—only $10. But, so as not to alert the Provider Plaintiff to the theft, he then falsified the firm's books—*i.e.*, made the books reflect that the Provider Plaintiff had been paid in full. As a result, the Provider Plaintiff would be out $50— even though Wihlborg had only taken $10 for himself. The Law Firm would then, as a matter of course, take the $30 it was owed for fees and costs and pay the balance (in our example, $60) to the client. And this is why the Provider Plaintiffs claimed losses in excess of $10 million, even though Wihlborg himself only *pocketed* about $2.3 million from them.

With this background in mind, we have little trouble concluding that the phrase "based on," as it appears in the bucket-two portions of the Underlying Complaint, suggests *at least* the same level of relatedness as the Exclusion's "arising out of." "Base," as a verb, means "to find a foundation on or basis for," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, https://unabridged.merriam-webster.com/collegiate/base (last accessed Sept. 26, 2022), or "to form a foundation for," OXFORD ENGLISH DICTIONARY (2d ed. 1989). These definitions fit snugly within the Florida Supreme Court's interpretation of "arising out of" as "'originating from,' 'having its origin in,' 'growing out of,' 'flowing

from,' 'incident to,' or 'having a connection with.'" *James River*, 540 F.3d at 1275 (quoting *Taurus Holdings*, 913 So. 2d at 539). It's thus no surprise that the Eleventh Circuit has used "based on" and "arising out of" interchangeably. *See, e.g.*, *Ailep v. McDonald*, 2021 WL 4452529, at *2 (11th Cir. Sept. 29, 2021) ("With respect to the final *res judicata* element, a case involves the same causes of action where the claim is *based on* 'the same nucleus of operative facts.' Put another way, claims are part of the same cause of action for res judicata purposes when they *arise out of* the same transaction or series of transactions." (emphasis added)). And this makes sense because, at the very least, if one thing "forms the foundation of" another, the two things are necessarily linked by "more than a mere coincidence." *James River*, 540 F.3d at 1275 (quoting *Taurus Holdings*, 913 So. 2d at 539).

And the third bucket (money the Law Firm refused to pay after the parties' attempts at cooperation broke down) similarly "originat[ed] from, ha[d] [its] origin in, [grew] out of, flow[ed] from, [was] incident to, or ha[d] a connection with" Wihlborg's theft. After all, according to the Underlying Complaint, the Law Firm withheld this money *only* as a way of "ratchet[ing] up the pressure [on the Provider Plaintiffs]," Underlying Complaint ¶ 110—all for the purpose of "coerc[ing] and pressure[ing] [Provider] Plaintiffs to accept a significantly reduced payment for the Medical Care they provided to the Impacted Firm Clients and to discontinue their investigation and pursuit of claims related to [Defendants'] misconduct," *id.* ¶ 107.

The relationship, in sum, between these three buckets of claims and Wihlborg's theft was (at the very least) "more than a mere coincidence." *James River*, 540 F.3d at 1275 (quoting *Taurus Holdings*, 913 So. 2d at 539). Indeed, a close review of the Underlying Complaint's nine counts shows that each *arose out of*, *related to*, or *involved* Wihlborg's theft.

We'll start with the first six counts, which are expressly premised on Wihlborg's theft. *See* Complaint ¶ 121 (Count I: Civil Theft) ("Defendant FLG, by and through its Firm Manager, *stole and diverted the Stolen Funds* in order to permanently deprive Theft Plaintiffs of those funds subject to their

liens, and to permanently deprive Theft Plaintiffs of their lien rights over the Stolen Funds." (emphasis added)); *id.* ¶ 133 (Count II: Conversion) ("Defendant FLG, by and through the Firm Manager, *stole and diverted the Converted Funds* in order to permanently deprive Theft Plaintiffs of those funds." (emphasis added)); *id.* ¶ 145 (Count III: Breach of Fiduciary Duty) ("Defendants breached that fiduciary duty by: . . . employing grossly inadequate personnel in the Firm's settlement department, including the Firm Manager, which enabled and *caused certain funds subject to Plaintiffs' liens to be stolen and diverted* by the Firm Manager[.]" (emphasis added)); *id.* ¶ 155 (Count IV: Constructive Fraud) ("Defendants abused their fiduciary relationship with Plaintiffs, and took unconscionable and improper advantage of Plaintiffs, by: . . . employing grossly inadequate personnel in the Firm's settlement department, including the Firm Manager, which enabled and *caused certain funds subject to Plaintiffs' liens to be stolen and diverted* by the Firm Manager[.]" (emphasis added)); *id.* ¶ 164 (Count V: Negligence) ("Defendants breached that duty of care by: . . . employing the grossly inadequate personnel in the Firm's settlement department, including the Firm Manager, which enabled and *caused certain funds subject to Plaintiffs' liens to be stolen and diverted* by the Firm Manager[.]" (emphasis added)); *id.* ¶¶ 174–75 (Count VI: Negligent Retention) ("Even though the Firm Manager was obviously unfit for the position of Settlement Case Manager, where he was overseeing disbursements from the Firm Trust Account, and even though Defendants knew or should have known that he was unfit, Defendants retained the Firm Manager in that position until approximately 2017—*once his theft had been discovered* and after *he stole in excess of $2 million in funds subject to Plaintiffs' liens. By retaining the Firm Manager in that position, Defendants knowingly placed Plaintiffs in severe risk and subjected them to likely theft or other harm*." (emphasis added)).

And the relationship between the last three counts and the theft is no less plain. In those three counts, the Provider Plaintiffs alleged that their injuries flowed from the Law Firm's failure to withhold disbursements until the Providers Plaintiffs' liens were satisfied. *See id.* ¶ 182 (Count VII: Breach of

Contract) ("Defendants breached the Contracts by (a) failing to notify Plaintiffs that they had received financial recoveries on behalf of the Impacted Firm Clients, and (b) *failing to withhold disbursement* of any such recoveries until Plaintiffs' outstanding liens for invoices owed for Medical Care were resolved." (emphasis added)); *id.* ¶ 190 (Count VIII: Promissory Estoppel) ("However, Defendants changed their position and broke their promises to abide by the LOPs and Lien Assignments, including by (a) failing to notify Plaintiffs that they had received financial recoveries on behalf of the Impacted Firm Clients, and (b) *failing to withhold disbursement* of any such recoveries until Plaintiffs' outstanding liens for invoices owed for Medical Care were resolved." (emphasis added)); *id.* ¶ 197 (Count IX: Accounting) ("Thus, Plaintiffs' LOPs and Lien Assignments, and the Florida Bar Rules, established a fiduciary relationship between Plaintiffs and Defendants, whereby Plaintiffs were dependent upon Defendants to maintain and secure Plaintiffs' lien rights, to notify Plaintiffs of recoveries subject to their lien rights, and *to withhold disbursement of funds subject to those lien rights* in the Firm Trust Account until the liens are resolved." (emphasis added)). And, as we've explained, the Underlying Complaint unambiguously averred that *these* improper disbursements were "based on" Wihlborg's scheme. *Id.* ¶ 101 ("Because Defendants *disbursed* the Impacted Firm Clients' funds *based on the Firm Manager's falsified Closing Statements*, the Firm no longer holds those additional funds subject to Plaintiffs' liens." (emphases added)).

Because the allegations in the Underlying Complaint unambiguously "show either that a policy exclusion applies or that no coverage exists, no duty to defend arises." *Kenneth Cole*, 763 F. Supp. 2d at 1334. And, since the "duty to defend is broader than the duty to indemnify," *Lawyers Title Ins. Corp. v. JDC (Am.) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995), Houston (which owed *no* duty to defend) likewise has *no* duty to indemnify, *see Nova Cas. Co. v. Waserstein*, 424 F. Supp. 2d 1325, 1332 (S.D. Fla. 2006) (Jordan, J.) ("The duty to defend is broader than the duty to indemnify, and thus, where the insurer has no duty to defend, it necessarily has no duty to indemnify." (citing *Fun Spree Vacations, Inc.*

*v. Orion Ins.*, 659 So. 2d 419, 421 (Fla. 3d DCA 1995); and then citing *Applestein*, 377 So. 2d at 231)).

\* \* \*

We therefore **GRANT** Houston's MSJ as to Count IV. And, because our ruling on the Theft of Funds Exclusion resolves the whole case, we needn't address Houston's three other claims for relief.[13]

### C.     Houston is Entitled to Reimbursement of its Defense Expenses

Because Houston had no duty to defend the Defendants in the Underlying Lawsuit, it's entitled to recoup the money it spent on that litigation. *See, e.g., James River Ins. Co. v. Arlington Pebble Creek, LLC*, 188 F. Supp. 3d 1246, 1255 (N.D. Fla. 2016) ("Under Florida law, James River wins. It effectively reserved its right to seek reimbursement when it offered to defend Arlington, and Arlington accepted its defense, so it is entitled to reimbursement now that it has been determined that it was never under a duty to defend."); *see also Jim Black & Assocs., Inc. v. Transcon., Ins. Co.*, 932 So. 2d 516, 518 (Fla. 2d DCA 2006) ("Now that it has been determined that Transcontinental never had a duty to defend, Transcontinental is entitled to reimbursement."). And Houston specifically warned the Defendants about this risk before it undertook the defense of the Underlying Lawsuit. *See* Houston ROR Letter at 15 ("Houston Specialty reserves the right to institute a declaratory judgment action against you and FLG on the issue of coverage under the policy and seek reimbursement of all

---

[13] In its MSJ, Houston observed that, if we take its position on *either* the Prior Knowledge Exclusion *or* the Retroactive Date Endorsement, we needn't consider its other claims. *See* Pl.'s MSJ at 11 n.4; *id.* at 14 n.7. The Defendants never responded to this point, *see generally* Defs.' Response—which we presume means *either* that they agree with Houston *or* that they've forfeited any contrary view, *see United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."). In any event, we agree with Houston and think this logic applies with equal force to the Theft of Funds Exclusion. Since we've found, in other words, that the Theft of Funds Exclusion bars coverage, we needn't consider whether the Prior Knowledge Exclusion, the Contractual Liability Exclusion, or the Retroactive Date Endorsement do too. If either party feels differently, though, it can (as always) note its disagreement in a motion for reconsideration.

attorney's fees and costs expended if there is a determination of no coverage."). The Defendants, in fact, concede that reimbursement is appropriate "in circumstances where the insurer had no duty to defend in the first place, but undertook to provide a defense anyway, while reserving the right to seek reimbursement from the insured for doing so once the court confirmed that the insurer had no such obligation." Defs.' Response at 20. That's, of course, where we find ourselves now. Houston is thus entitled to reimbursement of its defense expenditures.

CONCLUSION

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. The Plaintiff's MSJ [ECF No. 156] is **GRANTED** as to Count I of the Amended Complaint. The Plaintiff's MSJ is **DENIED** *without prejudice* in all other respects.

2. The Defendants' MSJ [ECF No. 159] is **DENIED as moot**.

3. By **October 17, 2022**, the parties shall file a *joint* notice setting forth their respective positions on the proper measure of Houston's damages. The parties must confer in good faith *either in person or by telephone* before filing that notice.

**DONE AND ORDERED** in the Southern District of Florida, this 29th day of September 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record